**STATE of Missouri,
Plaintiff–Respondent,**

v.

**Keith WILEY, Defendant–Appellant.**

No. 53422.

Missouri Court of Appeals,
Eastern District,
Division Two.

Jan. 31, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 28, 1989.

Application to Transfer Denied
April 18, 1989.

Henry B. Robertson, Asst. Public Defender, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Deborah Lee Ground, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

STEPHAN, Presiding Judge.

Defendant was found guilty of two counts of forcible sodomy, forcible rape, burglary and kidnapping. He was sentenced on June 19, 1987 as a "prior and persistent offender" and as a "class X offender" to consecutive terms of: thirty years on Count I (forcible sodomy), thirty years on Count II (forcible rape), thirty years on Count III (forcible sodomy), fifteen years on Count IV (burglary) and fifteen years on Count V (kidnapping). Defendant appeals the convictions and sentencing.

In the early morning hours of September 28, 1986, Danielle McClendon, age twelve, was awakened by an intruder. When Danielle looked up at the man, he covered his face. The man left the bedroom and returned with a butcher knife which he used to force Danielle out of bed, but she saw his face when he pulled her up. He took her out the back door, through an alley and to a garage. There were vapor lights in the alley which allowed Danielle to see the man's face. After slapping her and hitting her in the stomach because she resisted his attempts to force her to the floor, the man

removed her shorts and panties. The man moved Danielle to a second garage when Danielle thought she heard a noise. He forced her to the floor, performed an act of sodomy, followed by sexual intercourse, and then a second act of sodomy. She was then released and told to run home.

Danielle told her mother what had happened and the police were called. When the police arrived, Danielle led them to the first garage where her shorts and panties were found. She told the police her attacker wore a white t-shirt, blue jeans and white tennis shoes.

Prior to the assault, the victim's mother, Delores McClendon, and Mrs. McClendon's cousin, Robert Clark, were standing in front of the McClendon house. At approximately 11:30 p.m., defendant came by and joined them. Defendant stayed for a while, although estimates as to the length of time varied.[1] Defendant went to a liquor store and returned approximately ten minutes later with a bottle of liquor. Mr. Clark estimated that defendant remained another twenty or thirty minutes, while Mrs. McClendon estimated that the defendant remained an hour and forty-five minutes to two hours. When he left them, defendant apparently went around to the back door which was standing open, entered, and commenced his assault on Danielle. Mrs. McClendon stated that defendant was wearing a white t-shirt, jeans and white tennis shoes. After she heard Danielle's description of the man who attacked her, Mrs. McClendon told the police she knew the attacker's name was Keith. Danielle identified defendant in a police line-up on October 1, 1986.

Defendant presented an alibi defense. His mother testified that defendant came home at 2:00 or 2:15 a.m., wearing a blue dress shirt, black jeans and white tennis shoes. He changed shoes and left again for a party. Regina Fields testified that defendant was present at her party and he remained until sometime after 4:00 a.m. Byron Brewster testified defendant arrived at the party between 2:00 and 2:30 a.m.,

and that he was still there at 4:00 a.m. when a fight broke out.

Defendant raises three points on appeal. First, that the trial court erred in overruling defendant's motion to quash the jury after the state used peremptory strikes to remove four out of seven black jurors for racial reasons. Second, the trial court erred in overruling defendant's objection to the prosecutor's closing argument because the prosecutor drew an adverse inference from the absence of defendant's mother once her testimony had been given. Finally, that the trial court erred in sentencing defendant after finding him to be a class X offender because § 558.019, RSMo 1986, as applied to defendant, is ex post facto and, therefore, unconstitutional.

Defendant's first point is that the jury panel should have been quashed because the state used four of its peremptory strikes to remove black jurors in violation of the Equal Protection Clause. The state challenged four black venire members and three white. Defendant claims that the state provided contradictory reasons for its strikes and, further, failed to strike similarly situated white jurors.

■■■ Our decision here is controlled by *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986) and *State v. Antwine*, 743 S.W.2d 51 (Mo. banc 1987). *Batson* laid out a three part test for establishing a prima facie case of purposeful discrimination. First, the defendant must be a member of a cognizable racial group. Secondly, the defendant must show that the prosecutor exercised his peremptory strikes to remove members of defendant's race from the venire. Lastly, the defendant must be able to point to other relevant circumstances which would raise an inference that the prosecutor engaged in purposeful discrimination in selecting the jury panel. *Batson*, 106 S.Ct. at 1723. Relevant circumstances might include a pattern of strikes against black jurors or the underlying method of the prosecutor's questions and statements. *Id.*

---

1. Mr. Clark estimated that defendant remained there approximately twenty minutes. Mrs. McClendon estimated this time at forty-five minutes.

The defendant has complied with the first two steps of the test: defendant is black and some black venire members were peremptorily struck from the venire. We now direct our attention to the prosecutor's explanations for his strikes because the trial court considers these explanations in determining whether defendant has made a prima facie case. *Antwine*, 743 S.W.2d at 64.

■ The explanation should be neutral, specific, legitimate and reasonably related to the case to be tried. *Batson*, 106 S.Ct. at 1723. There are factors that the trial judge can take into consideration in assessing the legitimacy of the prosecutor's explanations. One is the susceptibility of the case to racial discrimination. *State v. Butler*, 731 S.W.2d 265, 269 (Mo. App.1987). For example, if the defendant, the victim and the key witnesses are all black, there would be very little advantage in striking blacks from the jury. *Id.* The judge may also consider the prosecutor's demeanor in questioning the veniremen and whether or not the prosecutor has engaged in a pattern of discrimination in the past. *Id.* Finally, the judge should consider the explanation itself. In doing so, the court determines whether similarly situated white jurors were struck on the same or comparable grounds, whether the explanation is overly broad, and whether the explanation applies specifically to the juror being struck.

The victim, Danielle McClendon, was a young, black girl. She was the key witness for the state because she identified the defendant. The state's witnesses also included Mrs. McClendon and Robert Clark, both of whom are black. We also note that, as far as we can see from the transcript, the prosecutor's demeanor did not lend itself to any form of discrimination.

That leaves the explanations themselves. We agree that the trial judge dismissed defendant's objections rather perfunctorily, but, after having reviewed the entire record, we can find no evidence of purposeful discrimination.

The prosecutor struck William Wallace because he had a son close in age to the defendant, and he had previously served as the foreman of a jury. The concern was that Mr. Wallace might identify with defendant as the parent of a child approximately the same age and that he might have leadership qualities that would place him in a better position to influence the others.

Defendant states that Robert Artega, a white juror, should have also been struck because he served as the foreman of a jury in the past. Mr. Artega did not, however, have a son approximately the same age as defendant. The concerns regarding sympathies toward a man approximately the same age as his own son were not present.

Donald Docket was struck because he was approximately the same age as defendant. Defendant claims that the strikes against Mr. Wallace and Mr. Docket are contradictory because one is old and the other young. We do not agree. These are merely two perspectives from which a juror could identify and sympathize with defendant; one in the role of parent and the other as peer.

■ Defendant also maintains that black veniremen were removed while similarly situated white veniremen were not. Evidence of similarly situated white veniremen left on the jury may be considered by the court in determining the validity of the state's explanations. *State v. Jones*, 747 S.W.2d 229, 233 (Mo.App.1988). Failure to strike a similarly situated white juror will not, however, always mandate reversal. *Id.*, at 232–233. There is still room for the state to base its challenges on "hunches", so long as those hunches are not racially motivated. *State v. Antwine*, supra, 65.

The state did not strike Joseph Fague, John Downer and Matthew Lynch, even though they were young men who might identify with defendant. We note, however, that the three white veniremen who were struck by the state, Mike Frix, Jeffrey Fahrenkamp and Michael Henson, were removed because they were young men, approximately the same age as defen-

dant.[2] The state was simply unable to strike all young men, but removed as many as possible considering the number of strikes available.

The two black women who were removed, Jennifer Miller and Sara Futrell, were challenged because they had relatives in the penitentiary. In both cases, the relatives had been incarcerated for murder. Defendant points out that juror Rose Flynn had a brother-in-law convicted of a crime and juror Warren Nottingham had "a relative by marriage who was also incarcerated for homicide."

Mrs. Miller told the court that her husband's cousin had been convicted of murder two years before, and Ms. Futrell's cousin was convicted of first-degree murder in 1986. On the other hand, Ms. Flynn said her brother-in-law had once been charged with assault but she thought the charges had been dropped. Mr. Nottingham stated that a "nephew by marriage somewhere down the line" was in the penitentiary for what he believed was a homicide that had occurred "probably fifteen years before." It seems that the jurors who were struck had close relatives currently incarcerated. The other two jurors were vague about the details of the crimes, and the crimes were more remote in time.

■ We, therefore, hold that the explanations provided by the state were legitimate and racially neutral. Defendant has not presented a prima facie case of purposeful discrimination. Point I is denied.

In his second point defendant alleges trial court error in overruling his objection during the state's closing argument. Defendant asserts that the prosecutor drew an adverse inference from the absence of defendant's mother during closing arguments. This inference, he claims, goes beyond the evidence in order to destroy the credibility of a vital defense witness.

The record shows that at the conclusion of her testimony, the trial judge said, "I'm going to release this witness and she can stay in the courtroom." Defense counsel stated, "I think she would like to be excused, your Honor." Defendant's mother declined the invitation to remain, saying "Yeah, I've been here all day."

The state made no reference to defendant's mother, Mrs. Thompson, in the opening portion of it's closing argument. Defense counsel then asserted, in her closing argument, the reasons why Mrs. Thompson was able to testify to the precise time defendant came home. In rebuttal, the state disputed this assertion. The relevant portions of the closing argument are as follows:

### DEFENSE CLOSING ARGUMENT

[MS. FOX]: You heard from Blanche Thompson. She told you that on that night, 2 o'clock, 2:15 I think she said in the morning, that she heard Keith come into the house and what did she tell you? She had turned the dining room of her house into a bedroom so her bed was very close to the front door, that when someone puts a key in the door she hears it, she wakes up.

She has a clock right there. When she heard Keith come in she looked at the clock and saw what time it was. She talked to him, wnated [sic] to know why he was going back out, noticed he changed his shoes. He went back out.

Mr. Chancellor wanted to know why she would pay attention to when he came back and forth and she told you that if you were the mother of boys, you'd be trained in this. I'd be trained in watching when those kids come in and when those kids go because they are always coming and going and I want to know where they are. What a lot of mothers do, pay attention to when their children come, watch that clock when they come in so they'll know when they're back in the house safely.

### STATE'S REBUTTAL ARGUMENT

[Mr. Chancellor]: Now he's thirty-two years old. I don't know if Mrs. Thomp-

---

**2.** The prosecutor had an additional reason for striking Mr. Henson. He "didn't like anything about Mr. Henson, his looks, his appearance, his attitude."

son watches every time a thirty-two-year-old son comes in and goes out. I'll leave that—you find yourself in a box. You're criticizing people's mothers, all right, but I'm going to say something about it and I'll let you—there's a word in the dictionary about this long. It's called "philoprogenitiveness." It means simply the natural love for a mother of her offspring, any offspring, and so she comes in and said those things, but what did she want to do? When she got finished, the Judge says, "You can stay."

MS. FOX: Your Honor, I'm going to object. This is not evidence. He's limited to the evidence and the inferences therefrom.

THE COURT: Overruled. Ladies and—

MS. FOX: May I approach the bench, please?

(Counsel approach the bench and the following proceedings were held out of the presence and hearing of the Jury).

MS. FOX: I object to any argument concerning whether or not his mother stayed in the courtroom and any further argument as to whether or not the McClendons are in the courtroom.

THE COURT: Objection overruled.

MS. FOX: The Prosecutor by law is limited to argument of the evidence and the inferences therefrom and I would like my objection to be continuing.

THE COURT: It will be shown as a continuing objection. Overruled.

(Proceedings returned to open Court).

THE COURT: Now you may proceed.

MR. CHANCELLOR: Wouldn't you expect her to be there? It's his mother. She came in I submit to you and did what she felt that she had to do. She did what she thought she ought to do. And I won't quarrel with her until I remember if I'm ever in that situation.

Whether or not closing argument is proper is within the broad discretion of the trial court and reversal occurs only upon abuse of that discretion. *State v. Ferguson*, 651 S.W.2d 521, 523 (Mo.App.1983). During closing argument the state has the right to comment on the evidence and on the credi-

bility of the witnesses. *State v. Franklin*, 526 S.W.2d 86, 89 (Mo.App.1975).

■ The excerpts from the trial transcript point out that the prosecutor was rebutting defense counsel's explanation of Mrs. Thompson's ability to remember the precise time her son came home. Moreover, it is not error for the state to challenge the credibility of a principal witness who has a familial relationship with the defendant. *State v. Butler*, 549 S.W.2d 578, 581–582 (Mo.App.1977); *State v. Gay*, 523 S.W.2d 138, 143 (Mo.App.1975).

We hold that the state's closing argument was a permissible attack on the credibility of an alibi witness. There was no abuse of discretion, and the point is denied.

■ In his final point, defendant maintains that the trial court erred in finding him a class X offender under § 558.019 RSMo 1986, because, when applied to him, the statute is ex post facto. The offenses defendant was charged with were committed on September 28, 1986. Section 558.019 RSMo 1986, became effective on January 1, 1987. Trial was held in May 1987 and sentencing occurred on June 19, 1987.

We first note that defendant has failed to preserve this point for review because it was not included in the motion for new trial. In order to preserve a constitutional question for appeal, an objection must be raised at the earliest opportunity, the sections of the constitution claimed to have been violated must be specified, and the point must be presented in a motion for new trial and adequately covered in the brief. *State v. Hoard*, 715 S.W.2d 321, 326 (Mo.App.1986). Due to the importance of the question, however, we will review for plain error. Rule 29.12(b).

■ Under § 558.019.4(3) RSMo 1986, a class X offender is defined as "one who has previously pleaded guilty to or has been found guilty of three felonies committed at different times." If a defendant is catego-

rized as a class X offender, the defendant must serve at least 80% of his sentence. § 558.019.2(3) RSMo 1986. Here, defendant was properly sentenced to 120 years imprisonment on the five counts. Prior to January 1, 1987 defendant would have been eligible for parole after serving twelve months of his sentence "in an orderly and peaceable manner without having any infraction of the rules or laws of the institution recorded against him." § 217.690.2. If § 558.019, RSMo 1986, applies to defendant as a class X offender, he must serve 80% (96 years) of his sentence before he will be considered for release.[3]

A recent decision of this court, *State v. Hillis*, 748 S.W.2d 694 (Mo.App.1988) is directly on point.

*Hillis* held that while the decision to grant or deny parole lies strictly with the Parole Board, the enactment of § 558.019, RSMo 1986, foreclosed defendant's ability to apply for parole after twelve months pursuant to § 217.690.2 RSMo 1986. This results in the defendant spending an increased minimum time period in the penitentiary, thereby increasing the punishment. Accord: *State v. Pruitt*, 755 S.W.2d 309 (Mo.App.1988); *State v. Pollard*, 746 S.W.2d 632 (Mo.App.1988); *State v. McCoy*, 748 S.W.2d 809 (Mo.App.1988). Our Supreme Court has recently cited with approval the holding in *Hillis*. *State v. Lawhorn*, 762 S.W.2d 820 (Mo. banc 1988).

For the same reasons stated in *Hillis* and *Lawhorn*, we hold that § 558.019 RSMo 1986, as it applies to defendant, is an ex post facto law, having become effective after the crimes were committed, and thus violates the United States Constitution, Article I, Section 10, and the Missouri Constitution, Article I, Section 13.

Thus, as we did in *Hillis* and in accordance with the Supreme Court's disposition ·of *Lawhorn*, we affirm the convictions but

remand to the trial court for resentencing consistent with the statutory guidelines in effect at the time the crimes were committed.

PUDLOWSKI, C.J., and DOWD, J., concur.

---

3. We are cognizant of the fact that the trial court also found the defendant to be a prior offender and a persistent offender. Either category allowed for sentence enhancement under § 558.016, RSMo 1986. Prior to the effective date of § 558.019, however, a defendant sentenced as either a prior or persistent offender would have been eligible for release as provided in § 217.690. Under § 558.019, however, a prior offender must serve 40% of his sentence, and a persistent offender must serve a minimum of 60% of his sentence.