ON APPLICATION FOR REHEARING
The opinion of June 14, 1991, is withdrawn and the following is substituted therefor.
Terry Bird and Jacob Warner appealed convictions of capital murder. The Court of Criminal Appeals affirmed. See Bird v.State, [Ms. 3 Div. 938, Feb. 23, 1990] 594 So.2d 644
(Ala.Cr.App. 1990), and Warner v. State, [Ms. 3 Div. 945, Feb. 23, 1990] 594 So.2d 664 (Ala.Cr.App. 1990). This Court granted certiorari review to consider whether the defendants were denied their rights to a fair and impartial trial by the prosecution's use of peremptory strikes to eliminate black veniremembers from the jury, and whether Bird, a white defendant, has standing to challenge the prosecution's use of peremptory strikes. We answer both questions in the affirmative, and we reverse.
In the trial of these defendants' consolidated cases, the chief deputy district attorney for Montgomery County, Ellen Brooks, and Deputy District Attorney Bruce Maddox used 17 of their 20 peremptory strikes to eliminate 17 of the 19 black veniremembers. The defendant struck 1, thus leaving only 1 black veniremember to serve on the jury. Before the jury was sworn, both defendants moved to quash the jury panel on the ground that the State's use of its peremptory strikes violated the principles expressed in Batson v. Kentucky, 476 U.S. 79,106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), which principles this Court had adopted in Ex parte Jackson, 516 So.2d 768 (Ala. 1986), and had grounded on state law, including Ala. Const., art. I, §§ 1, 6, and 22. Ellen Brooks, under direct examination by Mr. Maddox, then proceeded to make a showing for the record as to the reasons for her strikes. A summary of her explanations appears in the opinion of the Court of Criminal Appeals in Warner v. State, supra. For convenience, the pertinent reasons are summarized below:
 VENIREMEMBER NUMBER 93: She expressed reservations about the death penalty.
 VENIREMEMBER NUMBER 83: She expressed reservations about the death penalty. "Her husband was employed by the ABC Board. The district attorney's office had recently prosecute[d] regarding the ABC Board."
 VENIREMEMBER NUMBER 87: He expressed reservations about the death penalty. He also "had a paternity case with family court." Because he was 78 years old, he might be adversely affected by the length of the trial and the "gory" photographs it involved.[1]
 VENIREMEMBER NUMBER 1: He was a minister who indicated that he knew Warner and expressed reservations about the death penalty. One of his eyes did not seem to focus properly.
 VENIREMEMBER NUMBER 75: She worked in a department store where a member of the district attorney's staff had formerly worked. The staff member indicated that Number 75 was suspected of shoplifting. She was 19 years old and one of the defendants was 22.
 VENIREMEMBER NUMBER 31: He had been charged with possession of marijuana. He indicated that he "had heard of Mr. Shinbaum," attorney for Mr. Warner.[2]
 VENIREMEMBER NUMBER 113: She was a teacher and her husband was unemployed. She once had a student named Eloise Warner, the present name of defendant Warner's wife.
 VENIREMEMBER NUMBER 97: He was 73 years old, did not raise his hand for the administration of the oath, and had difficulty hearing "low voices."
 VENIREMEMBER NUMBER 27: She was 24 years old and lived in a high-crime area. She had a "negotiating a worthless instrument conviction" and did not respond to a question in general voir dire regarding misdemeanor convictions. Her last name was the same as that of *Page 679 
an individual once prosecuted by the district attorney's office.
 VENIREMEMBER NUMBER 37: She "had a disorderly conduct charge." On the written questionnaire, she "clearly and forcefully stated" that she knew none of the "attorneys or the defendants or their families," but did not indicate whether she knew the victim.
 VENIREMEMBER NUMBER 45: She was married to an assistant basketball coach who was employed by Alabama State University. The University had been under investigation by the White Collar Crime Unit. The district attorney's office had recently prosecuted someone connected with the University.
 VENIREMEMBER NUMBER 96: He was 28 years old, "single, and self-employed as a private duty nurse." Moreover, personal observation of him [indicated] that he had tendencies of being homosexual." The case involved some evidence of homosexual activity and the prosecutrix thought that he might know some of the witnesses.
 VENIREMEMBER NUMBER 33: She had once served on a jury in a criminal case that was subsequently dismissed. She had "difficulty in talking" and seemed to be unfamiliar with the term "shoplifting."
 VENIREMEMBER NUMBER 26: She lived in a "high crime" area. Her last name was the same as that of an individual once prosecuted by the district attorney's office.
 VENIREMEMBER NUMBER 76: She was 26 years old, lived in an apartment in a "high-crime" area, and worked as a cashier.
The trial judge, after cross-examination of Ms. Brooks by defense counsel, expressed some concern over the challenges of Veniremembers 26 and 45. Ultimately, however, he concluded that to grant the defendants' motion to quash the jury panel placed "too great of a burden on the State in explaining its reasons" for its challenges. He, therefore, denied the motion on the grounds that the prosecution's explanations were sufficiently race-neutral and that Bird lacked standing to challenge the exclusion of black veniremembers.
We take this opportunity to underscore the rule and policies that we announced in Jackson and Ex parte Branch, 526 So.2d 609
(Ala. 1987). In doing so, we examine the State's explanations for its strikes in light of our rule regarding the defendant's burden of production in presenting a prima facie case — especially as it is affected by the interplay of the various factors that we enumerated in Branch. In Branch, we explained:
 "The burden of persuasion is initially on the party alleging discriminatory use of peremptory challenges to establish a prima facie case of discrimination. In determining whether there is a prima facie case, the court is to consider 'all relevant circumstances' which could lead to an inference of discrimination. See Batson, 476 U.S. at 93, 106 S.Ct. at 1721, citing Washington v. Davis, 426 U.S. 229, 239-42, 96 S.Ct. 2040, 2047-48, 48 L.Ed.2d 597 (1976). The following are illustrative of the types of evidence that can be used to raise the inference of discrimination:
 "1. Evidence that the 'jurors in question share[d] only this one characteristic — their membership in the group — and that in all other respects they [were] as heterogeneous as the community as a whole.' [People v.] Wheeler, 22 Cal. 3d [258] at 280, 583 P.2d [748] at 764, 148 Cal.Rptr. [890] at 905 [(1978)]. For instance 'it may be significant that the persons challenged, although all black, include both men and women and are [of] a variety of ages, occupations, and social or economic conditions,' Wheeler, 22 Cal.3d at 280, 583 P.2d at 764[, n. 27], 148 Cal.Rptr. at 905, n. 27, indicating that race was the deciding factor.
 "2. A pattern of strikes against black jurors on the particular venire; e.g., 4 of 6 peremptory challenges were used to strike black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723.
 "3. The past conduct of the state's attorney in using peremptory challenges to strike all blacks from the jury venire. *Page 680 Swain [v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)].
 "4. The type and manner of the state's attorney's questions and statements during voir dire, including nothing more than desultory voir dire. Batson, 476 U.S. at 97, 106 S.Ct. at 1723; Wheeler, 22 Cal.3d at 281, 583 P.2d at 764, 148 Cal.Rptr. at 905.
 "5. The type and manner of questions directed to the challenged juror, including a lack of questions, or a lack of meaningful questions. Slappy v. State, 503 So.2d 350, 355 (Fla. Dist. Ct. App. 1987); People v. Turner, 42 Cal.3d 711, 726 P.2d 102, 230 Cal.Rptr. 656 (1986); People v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 764, 148 Cal.Rptr. 890 (1978).
 "6. Disparate treatment of members of the jury venire with the same characteristics, or who answer a question in the same or similar manner; e.g., in Slappy, a black elementary school teacher was struck as being potentially too liberal because of his job, but a white elementary school teacher was not challenged. Slappy, 503 So.2d at 352 and 355.
 "7. Disparate examination of members of the venire; e.g., in Slappy, a question designed to provoke a certain response that is likely to disqualify a juror was asked to black jurors, but not to white jurors. Slappy, 503 So.2d at 355.
 "8. Circumstantial evidence of intent may be proven by disparate impact where all or most of the challenges were used to strike blacks from the jury. Batson, 476 U.S. at 93, 106 S.Ct. at 1721; Washington v. Davis, 426 U.S. at 242, 96 S.Ct. at 2049.
 "9. The state used peremptory challenges to dismiss all or most black jurors. See Slappy, 503 So.2d at 354, Turner, supra.
 "After a prima facie case is established, there is a presumption that the peremptory challenges were used to discriminate against black jurors. Batson, 476 U.S. at 97, 106 S.Ct. at 1723. The state then has the burden of articulating a clear, specific, and legitimate reason for the challenge which relates to the particular case to be tried, and which is nondiscriminatory. Batson, 476 U.S. at 97, 106 S.Ct. at 1723."
Ex parte Branch, 526 So.2d 609, 622-23 (Ala. 1987) (footnote omitted).
This catalog of factors is illustrative only and not exhaustive. Harrell v. State, 555 So.2d 263, 268 (Ala. 1989). For example, the State's failure to articulate a legitimate reason for one or more strikes may constitute one of the "facts and . . . other relevant circumstances [that will] raise an inference" of discrimination. State v. Antwine, 743 S.W.2d 51,64 (Mo. 1987).
It follows, therefore, that the strength of the defendant's prima facie case depends, in large part, on the number of these factors present. Although a prima facie case is always rebuttable, the existence of a number of suspicious factors requires a more cogent explanation in rebuttal. Consequently, the burden of production, which shifts to the State once a prima facie case has been presented, increases in proportion to the strength of the defendant's prima facie case. In other words, a "weak prima facie case may be rebutted more readilythan a strong one." Gamble v. State, 257 Ga. 325,357 S.E.2d 792, 795 (1987) (emphasis added).
In this case, the venire consisted of 52 prospective jurors. The 19 black veniremembers comprised 36% of the venire. However, the fact that only one black juror was ultimately seated on the jury meant that blacks comprised only 8% of the trial jury. This fact alone reveals a disparate impact and immediately arouses suspicion of the existence of discriminatory intent. See Branch, 526 So.2d at 623; see alsoBatson, 476 U.S. at 93, 106 S.Ct. at 1721. To be sure, the fact that a larger percentage of black veniremembers eventually is seated on a jury raises less suspicion than if a smaller representation is seated and affords less support for a prima facie case of discrimination. See Batson, 476 U.S. at 101,106 S.Ct. at 1726 (White, J., concurring) ("not unconstitutional, without more, to strike one or more blacks from the jury"); Note, Batson v. Kentucky and the *Page 681 Prosecutorial Peremptory Challenge: Arbitrary and CapriciousEqual Protection, 74 Va.L.Rev. 811, 821-22 (1988). In fact, a large representation might afford the defendant no support at all and could even weaken his prima facie case should he be able to establish one on other grounds. See Harrell v. State,571 So.2d 1270 (Ala. 1990) (on return to remand).
Here, however, the suspicion of discriminatory intent raised by the disparately meager representation of black jurors is convincingly reinforced by the fact that the prosecutrix used 85% of her peremptory challenges, that is, 17 of 20 strikes, to eliminate 89% of the black veniremembers. See Branch,526 So.2d at 623; Slappy v. State, 503 So.2d 350, 355 (Fla. Dist. Ct. App. 1987). In addition, the State excluded veniremembers ranging from 19 to 78 years of age and representing a variety of occupations, thus raising the inference that race was the only shared characteristic. See Branch, 526 So.2d at 622;People v. Wheeler, 22 Cal.3d 258, 280, 583 P.2d 748, 764,148 Cal.Rptr. 890, 905 (1978).
Moreover, the prosecutrix struck black veniremembers but received without challenge white jurors having characteristics similar to those of the black members whom she challenged. She struck veniremember number 33 because she had once served on a jury in a criminal case that had been dismissed but did not challenge veniremember number 39 who had served on a criminal case in which the defendant was acquitted. She struck veniremember number 97, who was 73 years old, citing concern about his age in relationship to the length of the trial. She also struck veniremember number 87, again citing concern about the length of the trial and the gruesome nature of some photographs; she did not, however, challenge juror number 103, who was 74 years old. Such disparate treatment furnishes strong evidence of discriminatory intent. See Ex parte Lynn,543 So.2d 709, 713 (Ala. 1988) (Maddox, J., concurring); Branch,526 So.2d at 623.
Also relevant is what appears to be a pattern in the use of peremptory strikes by the Montgomery County District Attorney's office. As the Court of Criminal Appeals and the defendants point out, this issue has reached the appellate level in a number of cases from Montgomery County. See Parker v. State,568 So.2d 335 (Ala.Crim.App. 1990); Wagner v. State,555 So.2d 1141 (Ala.Crim.App. 1989); Leonard v. State,551 So.2d 1143 (Ala.Crim.App. 1989); Powell v. State, 548 So.2d 590
(Ala.Crim.App. 1988); Williams v. State, 530 So.2d 881
(Ala.Crim.App. 1988); Williams v. State, 548 So.2d 501
(Ala.Crim.App. 1988); and Acres v. State, 548 So.2d 459 (Ala.Crim.App. 1987). Four of these cases were reversed because of a violation of Batson and Branch. See Parker v. State; Powell v. State;Williams v. State, 548 So.2d 501 (Ala.Crim.App. 1988); andAcres v. State.
A number of those cases, like this one, were prosecuted by Bruce Maddox and Ellen Brooks. For example, in Parker, Mr. Maddox used 75% of his peremptory challenges (6 of 8 strikes) to eliminate black veniremembers. In Leonard, Mr. Maddox used 80% of his peremptory challenges (8 of 10 strikes) to remove black veniremembers. In Williams v. State, 530 So.2d 881
(Ala.Crim.App. 1988), Ms. Brooks struck 100% of the black jurors from the venire.[3]
An example of what appears to be a systematic practice of discrimination is a relevant factor to be considered both at the trial level and on review in assessing the strength of the defendant's prima facie case. Swain v. Alabama, 380 U.S. 202,85 S.Ct. 824, 13 L.Ed.2d 759 (1965); United States v. Mathews,803 F.2d 325, 332 (7th Cir. 1986); Branch, 526 So.2d at 623;Harrell, 555 So.2d at 266; State v. Wiley, 766 S.W.2d 700, 703
(Mo.Ct.App. 1989).
This evidence, in conjunction with the disparate impact of the peremptory strikes in this case, clearly supports the defendants' contentions and raises an inference *Page 682 
of discriminatory intent. The burden having shifted to the State to rebut the inference, the prosecutors' proffered explanations for their strikes must be examined in light of a particularly strong prima facie case. It thus became the prosecution's burden to articulate justifications for its strikes that were clear, cogent, and pertinent to the facts of this particular case. Branch, 526 So.2d at 623; see alsoBatson, 476 U.S. at 97-98, 106 S.Ct. at 1723-1724. In view of the strength of the prima facie case presented by the defendants in this instance, the State's explanations for its peremptory strikes fall considerably short of the standard we announced in Jackson and Branch.
After the defendants moved to quash the jury panel, the State offered grounds for its challenge of veniremember number 26 for the record. During that hearing, this colloquy followed:
 "MR. BLANCHARD: [Defense] As to juror Number 26, P.B., I believe you stated that the rationale for striking this juror was that she lives on Clanton Avenue?
"MS. BROOKS: That was part of it, yes.
 "MR. BLANCHARD: Which you identified as a 'high-crime area'?
 "MS. BROOKS: Yes sir. We had some difficulties in that area.
 MR. BLANCHARD: You don't know whether your office has ever prosecuted Mrs. B., do you?
 "MS. BROOKS: No sir. I believe I stated previously that we have prosecuted another person named B. and that name is a little bit unusual to me, and it immediately came to my mind and I made a note of [it] before we got going good.
 "MR. BLANCHARD: Weren't there a number of other people in the courtroom today, potential jurors that had names the same as people your office prosecuted?
"MS. BROOKS: I'm sure there were.
"MR. BLANCHARD: Well, were they?
 "MS. BROOKS: I'm sure there were. I don't know, I tried to make a note whenever I recognized anything that could be similar.
 "MR. BLANCHARD: Do you know if there were people whom you decided not to strike who had names the same as other people that your office has prosecuted?
 "MS. BROOKS: I recall every time that it came to my mind or one of co-counsel for the State, that we discussed it, and I believe we struck everyone we thought had a connection to someone we had prosecuted.
 "MR. BLANCHARD: Well, the question is not a connection but the same name. Do you routinely strike people that have the same name?
 "MS. BROOKS: No, sir. I consider the area the person is living, age, race, sex."
The bare allegation that a veniremember lives in a "high crime" area is also constitutionally deficient. Williams v.State, 548 So.2d 501, 506 (Ala.Crim.App. 1988). Not only do such allegations fail to demonstrate any relevance to the particular case sub judice, but, were they given credence, they could well serve as "convenient talisman[s] transformingBatson's protection against racial discrimination in jury selection into an illusion and the Batson hearing into an empty ceremony." C E J v. State, 788 S.W.2d 849, 857 (Tex.Ct.App. 1990). Also, this excuse might all too frequently serve to eliminate from jury service those individuals living at the lower end of the socioeconomic scale.
There was no showing, nor does it logically appear, why this particular veniremember would be less inclined toward the prosecution simply because she lived on Clanton Avenue. Thus, Ms. Brooks's perfunctory remarks regarding the residence of veniremember number 26 fail to set forth an acceptable race-neutral justification for this challenge.
Although age was not cited as a specific rationale for striking this particular veniremember, we realize that in certain cases age may serve as a legitimate racially *Page 683 
neutral reason for a peremptory strike. See Harrell, 555 So.2d at 268 n. 1. However, the age rationale is highly suspect because of its inherent susceptibility to abuse. Batson,476 U.S. at 106, 106 S.Ct. at 1728 (Marshall, J., concurring) ("[a]ny prosecutor can easily" ground a challenge upon an allegation that a "juror had a son about the same age as the defendant"). A mere summary declaration that age was a factor in the decision to strike is, therefore, constitutionally deficient and warrants reversal. Owens v. State, 531 So.2d 22,26 (Ala.Crim.App. 1987).
Finally, the failure of the State to engage in any meaningful voir dire on a subject of alleged concern is evidence that the explanation is a sham and a pretext for discrimination.Branch, 526 So.2d at 623; see also People v. Wheeler, 22 Cal.3d 258,281, 583 P.2d 748, 764, 148 Cal.Rptr. 890, 905 (1978);Slappy v. State, 503 So.2d 350, 355 (Fla.Dist.Ct.App. 1987). Thus, if the prosecutrix thinks that a veniremember may be related to a former defendant, she must ask the veniremember. See State v. Aragon, 109 N.M. 197, 784 P.2d 16, 17 (1989); see also Floyd v. State, 539 So.2d 357, 363 (Ala.Crim.App. 1987) (mere suspicion of a relationship insufficient); Note,supra, at 827 ("prosecutor's self-imposed ignorance [should not] preclude a Batson claim").
Here, a simple question directed to the veniremember could have dispelled any doubt about a possible relationship. However, neither the State nor the court engaged in any voir dire on this subject. In the absence of any examination, the trial judge had nothing on which to make the required "sincere and reasonable effort to evaluate the evidence and explanations based on the circumstances as he [knew] them." Branch,526 So.2d at 624. In reality, he had nothing on which to base an evaluation of the proffered rationale except the averment of the prosecutrix, which, in substance, amounted to a "mere general assertion" of nondiscrimination. See Batson,476 U.S. at 94, 106 S.Ct. at 1721.
We thus conclude that none of the explanations proffered by the State for its challenge of veniremember number 26 is sufficient to rebut the strong inference of discrimination evident in this case. The State may not cure the constitutional deficiency of an explanation simply by augmenting it with similar excuses none of which, standing alone, would be sufficient. This bootstrapping procedure amounts to nothing more than a summary denial of discriminatory intent. Because it falls far short of a "clear, specific, and legitimate reason for the challenge," it will not suffice to rebut a prima facie case of discrimination. Branch, 526 So.2d at 623.
Although one unconstitutional peremptory strike requires reversal and a new trial, we take this opportunity to accentuate the specific weaknesses of the State's explanations regarding a number of its challenges. In doing so, we point out that the State's failure to articulate a legitimate reason for its challenge of veniremember number 26 exposes its rationale for subsequent strikes to greater scrutiny. See State v.Antwine, 743 S.W.2d 51, 64 (Mo. 1987). Thus, even explanations that would ordinarily pass muster become suspect where one or more of the explanations are particularly fanciful or whimsical. As the Supreme Court of Georgia stated:
 "The explanation offered for striking each black juror must be evaluated in light of the explanations offered for the prosecutor's other peremptory strikes, and as well, in light of the strength of the prima facie case. The persuasiveness of a proffered explanation may be magnified or diminished by the persuasiveness of companion explanations, and by the strength of the prima facie case."
Gamble v. State, 257 Ga. 325, 357 S.E.2d 792, 795 (1987).
The prosecutrix conceded that she found it difficult to articulate valid justifications for her peremptory challenge of veniremember number 76. On direct examination, she answered as follows:
 "MR. MADDOX: [For the State] All right, would you tell the court what factors went into your determination to strike juror No. 76? *Page 684 
 "MS. BROOKS: Yes, sir. Juror Number 76 [was] P.R. According to my notes, [she] is 26 years of age, lives in an apartment, has a college degree, but yet is just a cashier at a finance kind of company. I had that she was employed in another capacity, and I didn't — mine was for data entry, and I felt like that there was some concern there that perhaps she was not using her degree, and I was concerned frankly that she may have had problems at work.
"MR. MADDOX: All right.
 "MS. BROOKS: It appeared to me that she was underemployed for her position. Also her age concerned me, and the fact that she was living in an apartment on South Perry Street. I live in an apartment. I'm not against people that do that but this particular address has had some difficulties. In fact there was a shooting, as I recall, not too long ago in some apartments on Perry Street.
 "MR. MADDOX: Did you discuss that matter with co-counsel?
"MS. BROOKS: Certainly.
 "MR. MADDOX: Did co-counsel indicate to you one of those intangible feelings you described earlier called a 'gut reaction' about that particular juror?
 "MS. BROOKS: This one is more particularly hard to articulate. I remember seeing her out in the venire, and it was somewhat difficult for me in discussing it with you, to articulate all of my reasons. But there was just something nagging at me about her, her job incongruity there."
Cross-examination developed the following:
 "MR. BLANCHARD: No. 76, P.R., I believe you enunciated your rationale that she was not using her degree to full potential; you said there was something about a gut reaction, plus she lived on South Perry Street, and it appeared to you she was underemployed?
"MS. BROOKS: Yeah, do you get what I'm saying?
"MR. BLANCHARD: No.
 "MS. BROOKS: Something bothers me about that. It's hard to articulate that, but it's like — I don't know — it's kind of like having a law degree, and you know, being a soda jerk kind of person. There is nothing wrong with that, I'm not saying she's a bad person, but it struck me as unusual, and, being suspicious, I wondered if something may have happened at her job. As I mentioned, I showed she was a data entry person, and, she stated — and I wrote, cashier. And I wondered what happened there.
 MR. BLANCHARD: You don't have any specific knowledge about anything having happened on her job; is that correct?
 "MS. BROOKS: I don't call up the employers, no sir.
 "MR. BLANCHARD: You don't know how long she's had her degree, do you?
 "MS. BROOKS: No sir. I could guess because I think she's about 26. But I don't know.
 "MR. BLANCHARD: Or what efforts she's made to utilize her degree, you don't know anything about that?
"MS. BROOKS: No."
Such unarticulated "gut feelings" about a veniremember will not rebut a Branch challenge. Accord United States v. Horsley,864 F.2d 1543, 1546 (11th Cir. 1989); Foster v. State,557 So.2d 634, 635 (Fla.Dist.Ct.App. 1990). Indeed, these " 'seat-of-the pants instincts' may often be just another term for racial prejudice." Batson, 476 U.S. at 106,106 S.Ct. at 1728 (Marshall, J., concurring).
By now, the State is well aware of the fact that it will be called upon to justify its peremptory challenges. Consequently, it elicits no surprise that a seasoned prosecutor could muster a colorably race-neutral explanation. Developments — Race AndThe Criminal Process, 101 Harv.L.Rev. 1472, 1581 (1988). Thus, the inability of the prosecutrix to articulate more convincing reasons for this strike is particularly revealing.
The State's expressed concern about this veniremember's employment is unsatisfactory for two reasons. First, there is no showing, nor does it logically follow, how her use or nonuse of a degree relates to the *Page 685 
facts or issues in this particular case. See Branch,526 So.2d at 623; Knight v. State, 559 So.2d 327, 329 (Fla. Dist. Ct. App. 1990); Mayes v. State, 550 So.2d 496, 498 (Fla. Dist. Ct. App. 1989). Second, as the record clearly indicates, Ms. Brooks failed to inquire into the matter. See Branch,526 So.2d at 623. Moreover, as we pointed out above, the bald assertion by the State that a veniremember lives in a high-crime area will not rebut a prima facie showing of discrimination. Similarly, in view of the pretextual nature of the State's explanations for striking veniremember number 26, the patent inability of the prosecutrix to articulate a racially neutral reason for her challenge of veniremember number 76, and the overall strength of this prima facie case, the State's summary profession of concern about the age of this veniremember has also been seriously compromised.
Because we conclude that the State has also failed to overcome the inference of discriminatory intent with respect to its challenge of veniremembers 26 and 76, explanations given by the State for its other challenges must be viewed with a greater degree of caution. In addition to the age and neighborhood explanations just discussed, we are concerned with a number of other explanations, such as the "body language" rationale given for the challenge of veniremember number 96, and with the "communication difficulty" expressed as one reason for the exclusion of veniremember number 33. Both of these explanations are especially subject to abuse because of their insusceptibility to an objective evaluation by the trial judge. See C E J v. State, 788 S.W.2d 849, 857 (Tex.Ct.App. 1990) (lack of eye-contact with prosecutor "ripe for abuse and subterfuge"); State v. Tomlin, 299 S.C. 294, 384 S.E.2d 707,710 (1989) (peremptory challenge of veniremember because she "walked slow [and] talked low" violated Batson).
This case represents another instance where the State has unnecessarily jeopardized a prosecution by interjecting the impermissible element of racial bias. Disregard for the "red flag" raised by Justice Jones in Lynn, 543 So.2d at 714-15
(Jones, J., concurring), further jeopardizes the future of the peremptory challenge and lends impetus to the call of courts and commentators to abolish the use of the strike. See, e.g.,Batson, 476 U.S. at 105-08, 106 S.Ct. at 1727-29 (Marshall, J., concurring); T. Massaro, Peremptories of Peers? — RethinkingSixth Amendment Doctrine, Images Procedures, 64 N.C.L.Rev. 501, 560 (1986); Developments, supra, at 1582 ("better solution to the problem of discriminatory use of peremptory challenges is the complete elimination of the prosecutor's use of them").
The defendants' motion to quash the jury panel should have been granted. In view of the strength of the defendants' prima facie case and the failure of the State to come forward with clear, cogent explanations in rebuttal, the trial judge's denial of that motion was clearly erroneous.
 Standing
The Court of Criminal Appeals held that defendant Bird, a Caucasian, lacked standing to contest the State's use of peremptory strikes to eliminate blacks from the trial jury. It reasoned that a defendant must be a member of the same "cognizable minority" as the excluded juror in order to challenge the State's peremptory strikes under the narrow holding of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712,90 L.Ed.2d 69 (1986). See Bird v. State, 594 So.2d 644, 646.
While Bird's case was under consideration before this Court, the United States Supreme Court decided Powers v. Ohio, ___ U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). In Powers, the Supreme Court held that a white criminal defendant has standing under the Equal Protection Clause of theFourteenth Amendment to challenge the prosecution's use of peremptory strikes of black veniremembers. The Court noted that a criminal defendant not only suffers a "cognizable injury" as a result of the State's discriminatory use of peremptory strikes, but also develops and bears with the improperly excluded jurors a close relationship. The Court concluded that these factors, coupled with the limited *Page 686 
ability of the excluded veniremembers to secure redress for the injury in their own behalf, confer standing upon a criminal defendant to challenge the peremptory strikes of jurors who are not members of the defendant's race.
Although it is now clear that Bird has standing under theFourteenth Amendment to challenge the peremptory strikes of blacks from the trial jury, he also has standing under adequate and independent state law grounds, including the Constitution and statutes of Alabama and this state's declared policy against racial discrimination in jury selection. In Ex parteJackson, 516 So.2d 768 (Ala. 1986), this Court's first encounter with the issue of racially based peremptory strikes in the Batson era, the Court recognized independent state-law grounds on which to challenge the prosecution's strikes. InJackson, after holding that Swain v. Alabama, 380 U.S. 202,85 S.Ct. 824, 13 L.Ed.2d 759 (1965), imposed too great a burden of proof of discrimination, the Court stated that "[o]ur stateconstitution requires that Jackson be entitled to test the prosecution's use of its peremptory strikes under a rulesimilar to the one set forth in Batson v. Kentucky." Jackson,516 So.2d at 772 (emphasis added). In particular, the Court noted the applicability of Ala. Const. art. I, §§ 1, 6, and 22.Jackson, 516 So.2d at 772. See also Ex parte Branch,526 So.2d 609, 619-20 (Ala. 1987) (quoting Jackson).
Section 6, in terms similar to its counterpart in U.S. Const. amend. VI,[4] guarantees that "in all criminal prosecutions, the accused has a right to . . . a speedy, public trial, by animpartial jury of the county or district in which the offense was committed." (Emphasis added.) Section 6, thus, requires an "impartial jury," that is, a " 'body [that is] truly representative of the community' and not the organ of any special group or class." Glasser v. United States, 315 U.S. 60,86, 62 S.Ct. 457, 472, 86 L.Ed. 680 (1942). The concept of an impartial jury, at the very least, forbids racial discrimination in the selection of the venire from which the trial jury ultimately will be chosen. Peters v. Kiff,407 U.S. 493, 504, 92 S.Ct. 2163, 2169, 33 L.Ed.2d 83 (1972); see alsoTaylor v. Louisiana, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690
(1975); Thiel v. Southern Pacific Co., 328 U.S. 217,66 S.Ct. 984, 90 L.Ed. 1181 (1946); Smith v. Texas, 311 U.S. 128,61 S.Ct. 164, 85 L.Ed. 84 (1940); see generally M. Daughtrey,Cross-Sectionalism in Jury-Selection Procedures After Taylor v.Louisiana, 43 Tenn.L.Rev. 1 (1975); Developments — Race andThe Criminal Process, 101 Harv.L.Rev. 1472, 1557-88 (1988).
Consistent with this understanding of § 6 guarantees, the Alabama legislature, in 1978, renovated this state's jury selection procedures through Act No. 594. Section one of the Act declared:
 "It is the policy of this state that all persons selected for jury service be selected at random from a fair cross section of the population of the area served by the court and that all qualified citizens have the opportunity in accordance with this act to be considered for jury service in this state and an obligation to serve as jurors when summoned for that purpose."
Acts 1978, No. 594, p. 712 (codified at Ala. Code 1975, §12-16-55) (emphasis added). This " 'fair cross section' requirement . . . is analogous to the requirement, derived from the Sixth Amendment to the United States Constitution, . . . that 'petit juries must be drawn from a source fairly representative of the community.' " Rayburn v. State,495 So.2d 733, 734 (Ala.Crim.App. 1986). Sections 4 and 5 of the Act provided detailed formulas and directions for implementing its expressed policy. Alabama constitutional and statutory law is violated, therefore, whenever the State participates in the arbitrary and capricious exclusion of members of a cognizable group from the jury venire because of their race. Thus, under the representative-cross-section analysis, a defendant has standing to challenge *Page 687 
such action regardless of whether he or she is amember of the excluded group.
Racial discrimination in selection of the jury venire is particularly obnoxious for two reasons. First, it denies the defendant the benefit of a constituency based upon diversity — a concept central to the American experience. By maximizing diversity, the "preconceptions" and "biases" of the representative factions, "to the extent they are antagonistic, will tend to cancel each other out." People v. Wheeler,22 Cal.3d 258, 267-68, 583 P.2d 748, 755, 148 Cal.Rptr. 890, 896. Thus, it is unnecessary for the defendant to prove actual injury as a result of the discrimination. It is enough that discrimination "deprives the jury of a perspective on human events that may have unsuspected importance in any case that may be presented." Peters, 407 U.S. at 503-04,92 S.Ct. at 2168-69.
Second, the continued viability of our way of life depends, in large part, upon our ability to involve all segments of society in the fundamental institutions of the body politic, not the least of the which is our judicial system. Cf.Powers, ___ U.S. at ___ — ___, 111 S.Ct. at 1368-69. Therefore, when members of any racial group are arbitrarily excluded from jury service, that group is denied the fundamental right of participation in a vital organ of government. As a result, public confidence in the law and legal system is eroded and the judicial system itself is denied the benefits of the insight and inspiration provided by a truly "mosaic" commonwealth. Cf. Ballard v. United States,329 U.S. 187, 195, 67 S.Ct. 261, 265, 91 L.Ed. 181 (1946); Batson,476 U.S. at 99, 106 S.Ct. at 1724; see generally E. Richardson,Strangers in this Land: Pluralism and the Response to Diversityin the United States (1988).
In Ex parte Branch, 526 So.2d 609 (Ala. 1987), this Court discussed the applicability of Act No. 594 and its "codification" of the fair-cross-section requirement, to the selection of the trial jury and to the State's use ofperemptory strikes. In that case, the Court said:
 "We believe that the Legislature intended, in adopting this public policy, that our trial juries should be selected from a list which contains a fair cross section of the area served by the court, and that any form of discrimination against a particular juror on account of race . . . is prohibited, and if liberally interpreted to apply to the State's use of peremptories, the state policy is not inconsistent with Batson or Jackson
requirements."
Id. at 619 (emphasis added). Consistent with that statement is this Court's longstanding policy of construing the "fundamental rights" provisions of Ala. Const. art. I "liberally . . . in favor of the citizen." See Davis v. State, 292 Ala. 210,291 So.2d 346 (1974); Gayden v. State, 262 Ala. 468, 80 So.2d 501
(1955). Consequently, there is no reason to restrict the application of the fair-cross-section guarantees of § 6 of the Alabama Constitution and Ala. Code 1975, §§ 12-16-55, -56, to the selection of the venire from which the trial jury will be chosen.
Indeed, the foregoing discussion regarding the rationale and policies against racial discrimination in the selection of the venire applies as cogently in respect to the impermissibly arbitrary and capricious exclusion of members of a cognizable racial group through the use of peremptory strikes. Conferring standing upon a defendant to challenge such discrimination regardless of his race most assuredly serves to facilitate those policies. The defendant suffers a deprivation of rights guaranteed under the Constitution and laws of this state whenever he is subjected to a judicial procedure that has been tainted by invidious racial discrimination at any stage of the jury selection. The guarantees that surround the jury selection process at the threshold stage should not disappear during voir dire, the stage that bears most directly upon the defendant and upon the trial process. See Fields v. People, 732 P.2d 1145,1153 n. 14 (Colo. 1987). It makes no sense to insist that this state "draw up its jury lists pursuant to neutral procedures [only to] resort to discrimination at 'other stages in the selection process.' " See Batson, 476 U.S. at 88,106 S.Ct. at 1718 (quoting Avery v. Georgia, *Page 688 345 U.S. 559, 562, 73 S.Ct. 891, 893, 97 L.Ed. 1244 (1953)).
A number of sister States have reached similar results based upon the protections secured by the "impartial jury" guarantees embodied in their respective constitutions. For example, inPeople v. Wheeler, 22 Cal.3d 258, 583 P.2d 748, 148 Cal.Rptr. 890
(1978), the California Supreme Court held that "the use of peremptory challenges to remove prospective jurors on the sole ground of group bias violates the right to trial by a jury drawn from a representative cross-section of the community under article I, section 16, of the California Constitution."Wheeler, 22 Cal.3d at 277-78, 583 P.2d at 761-62,148 Cal. Rptr. at 903. It approved the holdings in Taylor and Peters
that the "defendant need not be a member of the excluded group in order to complain of a violation of the representative-cross-section rule." Wheeler, 22 Cal.3d at 281,583 P.2d at 764, 148 Cal.Rptr. at 905-06. In extending the application of the representative-cross-section rule from the selection of the jury venire to the selection of the trial jury, the court stated:
 "It is that degree of representativeness — whatever it may prove to be — that we can and must preserve as essential to trial by an impartial jury. Certainly the prospective jurors are then subject to challenges for cause and peremptory challenges on grounds of specific bias; but for the reasons stated above we cannot countenance the decimation of the surviving jurors by peremptory challenges on the ground of group bias alone."
Id. at 278, 583 P.2d at 762, 148 Cal.Rptr. at 903.
The Florida Supreme Court recently held that "under article I, section 16 of the Florida Constitution[5] it is unnecessary that the defendant who objects to peremptory challenges directed to members of a cognizable racial group be of the same race as the jurors who are being challenged." Kibler v. State,546 So.2d 710, 712 (Fla. 1989). In so holding, it extended the fair-cross-section requirement of its state constitution to preclude the discriminatory use of peremptory strikes in selection of the trial jury. See also Fields v. People,732 P.2d 1145 (Colo. 1987); Commonwealth v. Soares, 377 Mass. 461,387 N.E.2d 499 (1979) (discriminatory peremptory challenges prohibited by the cross-section provisions of the state constitution); State v. Aragon, 109 N.M. 197, 784 P.2d 16
(1989) (adopting the Wheeler rationale based upon N.M. Const. art. II, § 14).
Moreover, it is well established that Ala. Const. §§ 1, 6, and 22 combine to guarantee equal protection of the laws. ExParte Branch, 526 So.2d 609 (Ala. 1987); Mayo v. RouselleCorp., 375 So.2d 449 (Ala. 1979); Black v. Pike County Comm'n,360 So.2d 303 (Ala. 1978), City of Hueytown v. Jiffy Chek Co.of Alabama, 342 So.2d 761 (Ala. 1977); Pickett v. Matthews,238 Ala. 542, 192 So. 261 (1939). Those guarantees are most clearly implicated in cases such as this one, which involves defendants of different racial groups. To hold that Warren is entitled to a new trial because he is black, but that Bird, his codefendant, is not so entitled because he is white, would violate the essence of equal protection.
Therefore, a defendant has standing to request aBatson hearing whenever (1) the State has exercised peremptory challenges to exclude members of a distinct racial group; and (2) the defendant requests such a hearing regardless of whether he is a member of that distinct group. Cf. Harrell v. State,555 So.2d 263, 267-68 (Ala. 1989); Rayburn v. State,495 So.2d 733 (Ala.Crim.App. 1986); Williams v. State, 453 So.2d 367,369 (Ala.Crim.App. 1984); State v. Jones, 293 S.C. 54,358 S.E.2d 701 (1987). Once this threshold requirement has been met, the defendant must then prove a prima facie case within the general framework of Batson, Jackson, and Branch.
This opinion should not be read to require that the racial composition of the trial *Page 689 
jury actually correspond to that of the population from which it was drawn. The diversity of our society renders such an endeavor logistically prohibitive. See Commonwealth v. Soares,377 Mass. 461, 387 N.E.2d 499, 512 (1979). In other words, "[d]efendants are not entitled to a jury of any particularcomposition." Taylor, 419 U.S. at 538, 95 S.Ct. at 702
(emphasis added). This opinion should be taken only as requiring that a white defendant be allowed standing to challenge, as racially discriminatory, the exclusion of black jurors through the use of the peremptory strike.
For the foregoing reasons, the judgments are reversed and the two causes are remanded to the Court of Criminal Appeals with directions to remand them to the trial court for further proceedings consistent with this opinion.
ORIGINAL OPINION WITHDRAWN; OPINION SUBSTITUTED; REVERSED AND REMANDED WITH DIRECTIONS; APPLICATION FOR REHEARING OVERRULED.
MADDOX and INGRAM, JJ., concur.
HORNSBY, C.J., and SHORES, HOUSTON, STEAGALL and KENNEDY, JJ., concur as to the holding that the State violated theBatson v. Kentucky principle and concur in the result as to the holding on the standing issue.
HORNSBY, C.J., and MADDOX, SHORES, HOUSTON, STEAGALL, KENNEDY and INGRAM, JJ., concur in the overruling of the application for rehearing.
[1] Warner does not contest the state's reasons for the challenge of this veniremember.
[2] Only Bird contests the state's reasons for the challenge of this veniremember.
[3] In Williams, the Court of Criminal Appeals did not address the defendant's claim of discrimination, because counsel for the defense had failed to raise a timely objection to the selection of the jury panel. Williams, 530 So.2d at 885-86.
[4] The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed."
[5] Fla. Const. art. I, § 16, provides for a "speedy and public trial by impartial jury in the county where the crime was committed."