Timothy John Yelder petitioned this Court for a writ of certiorari to review a judgment of the Court of Criminal Appeals affirming his convictions for burglary, sodomy, and rape. We granted the petition in order to determine whether the prosecution's use of peremptory strikes to eliminate potential black jurors from the jury venire violated the principles set forth by this Court in Ex parte Branch, 526 So.2d 609
(Ala. 1987), and Ex parte Bird, 594 So.2d 676 (Ala. 1991), guaranteeing the constitutional right to an impartial trial. We reverse and remand. *Page 108 
In the trial of this case, the prosecution used 24 of its 32 peremptory strikes to remove 24 of the 27 black veniremembers. Following the defendant's timely objection to the racial composition of the prospective jury panel, the prosecution offered various explanations for the prosecution's strikes. A summary of some of those explanations, as set forth inYelder v. State, 630 So.2d 92 (Ala.Cr.App. 1991), and as supplemented by the defendant pursuant to Ala.R.App.P. 39(k), follows:
 "[VENIREMEMBER NUMBER 72] She was having some question about her eyesight in response to the question we asked about that, and, in addition to a couple of questions we asked, where the judge went row by row asking if she had a response, she didn't respond the first time, and toward the end when you were about to go on to the next question, she finally had a response. Her response time was very slow, I was afraid she would not be favorable to us, and might not be able to deal with the multitude and volume of the information that we intend to offer, much of which is new in this case, particularly, the [evidence of a] scientific nature. She also had on a pin that said 'We care.' I really, really wasn't sure what that meant, but it worried me a little bit.
 "[VENIREMEMBER NUMBER 75] I don't know whether it was his age [69] in and of itself, or some physical condition he has, but he seemed to have difficulty carrying himself and listening to the court and responding to what the court said to him. He was very hesitant in answering, or he had difficulty in understanding — both understanding and speaking. I couldn't tell whether he had a hearing problem or not, but I had notes to that effect, and I didn't believe he could give the attention to this case that it deserves.
 "[VENIREMEMBER NUMBER 132] Number 132 . . . seemed to have some difficulty understanding what the court was saying to her about the matters she may or may not have heard regarding the case, and her responses to the court were of such, that both from the way she said things, and the way she put her sentences together, her articulation, I couldn't understand a word she said, and I was concerned both about her ability to perceive what was being said to her, and her ability to mentally communicate with other jurors, particularly on complicated matters such as we are going to have evidence in this case regarding the scientific evidence. I was afraid she could not meaningfully discuss the case with her fellow jurors. Additionally, she . . . seemed to show either an extreme disinterest in what was going on, such that she would not listen to the evidence, or an extreme inability to listen and understand what was going on. She chewed gum while she was standing there trying to talk to the court, and I just didn't believe that she would be able to give to this case the attention and consideration that it deserved.
 "[VENIREMEMBER NUMBER 151] We did not have as much information on her as we normally have, and we had to do some very quick research and guessing at her age and so forth. We found that there is a criminal record on [a person having the same name] of a similar age range . . . for fraud and receiving stolen property in another county. She indicated during voir dire that she knew Mr. Wagstaff. On that question, . . . she seemed to mumble a great deal in the voir dire. I noted she sat about four or five rows back, and I could see . . . that she was mumbling during the voir dire, directing her comments to no particular person. Her actions indicated some hostility, I think, toward the situation. I'm not sure exactly how that was directed. I do, based on my experience, have an opinion, but I did not believe, based on the totality of those circumstances that she would be a very good juror for the state."
(Emphasis added.)
In many respects, this case bears a remarkable resemblance toEx parte Bird, 594 So.2d 676 (Ala. 1991). First, the statistics are strikingly similar. In Bird, although "black veniremembers comprised 36% of the venire," the percentage of black jurors actually seated on the jury represented "only 8% of the trial jury." Id. at 680. The State, in that case, "used 85% of [its] peremptory *Page 109 
challenges, that is, 17 of 20 strikes, to eliminate 89% of the black veniremembers." Id. at 681. In this case, the jury pool contained a total of 86 veniremembers of which only 27, that is, 31%, were black. The State then used 75% of its peremptory challenges — 24 of 32 strikes — to reduce that 31% by another 89%.[1]
As we pointed out in Bird, the sheer weight of statistics such as these raises a strong inference of racial discrimination requiring clear and cogent explanations by the State in rebuttal. Id. at 680-81. Instead of such explanations, however, those proffered in this case virtually parallel the whimsical, ad hoc excuses we rejected in Bird — in particular, the State's explanations for its challenges of veniremember number 26 (same name as someone allegedly prosecuted by the district attorney's office), id. at 682-83; veniremember number 76 (excluded because of prosecutrix's "gut reaction"),id. at 684; veniremember number 96 (excluded because of "body language"), id. at 685; and veniremember number 33 (alleged "communication difficulty"). Id.
Moreover, the "articulation" or "communication" difficulties cited by the State as reasons for its challenges of veniremember number 75 and number 132 are not supported by the record. Specifically, the trial court's voir dire of veniremember number 75 elicited the following responses:
"Q. [By the Court] Your name, please?
"A. E.J. McCorvey.
 "Q. What this is about, Mr. McCorvey, when somebody has seen something in the paper or knows something about a case, we have to be real careful about it, that's why we are doing it this way. What is it you saw, or read, or heard, or know about this case?
 "A. I don't know nothing but what I saw in the papers.
 "[Interjection by the prosecution] Excuse me, your Honor, I didn't hear him.
 "[The Court] He knows nothing except what he saw in the papers.
"A. I don't even know anything about it.
"[The Court] He doesn't know the gentleman.
 "Q. Let me ask you this, this is real important. Would anything you saw in the paper or know about this case, would any of that cause you to have an opinion, a fixed opinion as to whether or not this man, here, is guilty or whether he is not guilty of this . . . charge?
"A. I have no knowledge of it.
 "Q. Would you be able to give Mr. Yelder and the State, would you be able to give both of them a fair trial based strictly and based entirely on what comes from that witness stand?
"A. I would.
"[The Court] Anything further?
"[The prosecution] No, sir.
"[The defense] No, sir.
"[The Court] Thank you, sir. Next juror."
Veniremember number 132 responded similarly to the court's voir dire:
"Q. [By the Court] Your name, please?
"A. Christine Dunn.
 "Q. What this is about, Mrs. Dunn, the law says that when somebody has seen something about the case in the papers, we need to be real careful about that, that's why we are handling this in this way. What is it that you know about the case, or have read about it, or saw about it?
 "A. Oh, I had been reading about the case, I had been keeping up with it in the newspaper.
 "Q. All right. Let me ask you this. Would anything that you have seen about the case or read about the case cause you to have a fixed opinion as to whether or not Mr. Yelder, here, is guilty or innocent of these charges?
"A. No.
 "Q. Would you be able to try the case based strictly and entirely on what comes from that witness stand, and not based on anything you may or may not have seen in the press?
"A. Yes. *Page 110 
 "Q. Have you got any problem in rendering a verdict to be fair to the State and fair to Mr. Yelder?
"A. No.
 "Q. If they proved to you beyond a reasonable doubt that he is guilty, would you have any problem finding him guilty?
"A. No.
"[The Court] Anything further?
"[The prosecution] No, sir.
 "[The defense] Ask her if there was a reasonable doubt, would she have any problem finding him not guilty?
 "Q. If there was a reasonable doubt as to his innocence, I mean to his guilt, would you have any problem finding him not guilty?
"A. No.
"[The Court] Thank you. Next juror."
Obviously, the State's allegations of communication deficiencies on the part of these veniremembers are not only wholly without support in the record, but are directly refuted by it. Perhaps most cogently, the record, which reveals a series of clear and unequivocal responses given by veniremember number 132, forcefully contradicts the prosecution's assertions that he "couldn't understand a word she said," because of "the way she put her sentences together." We are compelled to conclude that the explanations advanced by the State for its challenges of these veniremembers represent no more than a pretext for racial discrimination.
We regret that the conduct of the prosecution has, because of actions taken on the basis of race, once again necessitated a retrial, thus creating an additional strain on the judicial and economic resources of this state. At the present time, "blacks are serving in substantial numbers as jurors and meting out stiff sentences, including death. This is because, although in some instances blacks may be the perpetrators of crime, in even more substantial numbers, they are the victims of crime."Beck v. State, 396 So.2d 645, 665 (Ala. 1980) (Adams, J., concurring specially). Consequently, we look forward to the eventual demise of the notion that blacks possess an inherent bias in favor of defendants. In the instant case, however, the judgment of the Court of Criminal Appeals is reversed and the cause is remanded with directions to remand to the trial court for a new trial.
REVERSED AND REMANDED WITH DIRECTIONS.
HORNSBY, C.J., and MADDOX, SHORES and INGRAM, JJ., concur.
HOUSTON, J., dissents.
[1] Ultimately, two black veniremembers were seated on the jury.