611 So.2d 1133 (1992)
Altion Maxine WALKER
v.
STATE.
7 Div. 164.
Court of Criminal Appeals of Alabama.
August 21, 1992.
Rehearing Denied October 23, 1992.
Certiorari Denied January 22, 1993.
Ruth E. Friedman, Atlanta, GA, for appellant.
*1134 James H. Evans, Atty. Gen., and Sandra J. Stewart and Robert E. Lusk, Jr., Asst. Attys. Gen., for appellee.
Alabama Supreme Court 1920188.

ON RETURN TO REMAND
PATTERSON, Presiding Judge.
The appellant, Altion Maxine Walker, was convicted after a jury trial of the capital offense of murder for hire, in violation of § 13A-5-40(a)(7), Code of Alabama 1975, and was sentenced to death. On appeal, in light of the United States Supreme Court's decision in Powers v. Ohio, 499 U.S. ___, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), this court remanded the case to the trial court to conduct a hearing pursuant to Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). See Walker v. State, 586 So.2d 49 (Ala.Cr.App.1991). At that hearing, District Attorney Robert Rumsey provided reasons for striking 11 of 15 black veniremembers. Four blacks served on the jury.
The prosecutor's original notes regarding veniremembers were available and consist of (1) a list of the veniremembers' names, with Rumsey's own comments taken during voir dire examination of each panel; (2) the strike sheet that reflects his own comments about information gleaned during the initial identification process; and (3) the "master list" that contains each veniremember's name, address, sex, race, and date of birth along with comments written several weeks before jury selection by Investigator Dennis Surrett, who had compiled this information by talking with people "throughout the county," including various specified law enforcement officials. Copies of these notes were subsequently offered into evidence by the appellant (defense exhibits nos. 1-3). These three exhibits will subsequently be referred to as "Rumsey's contemporaneous notes." However, Rumsey admitted during his testimony that he had reconstructed his explanations by reviewing the contemporaneous notes of his assistant district attorneys (defense exhibits nos. 4-7) and by asking law enforcement officers who had allegedly provided information about the veniremembers at the time of trialinvestigators Alvin Kidd, Frank Strickland, and Frank Walliswhat they had told him about veniremembers at the time of trial. The prosecutor explained that, although he did not use or look at his assistant district attorneys' notes while he was striking the jury, he did confer with the attorneys. He further explained that the named officers were in and out of the courtroom during the jury striking and that they provided information in addition to that previously compiled in regard to the veniremembers. As will be apparent from the discussion to follow, Rumsey's contemporaneous notes rarely reflect the specific reason he gave during the Batson hearing for striking a veniremember.
We are very concerned here that we do not have the prosecutor's own reason for exercising each strike as he did. Understandably, it appears that he could not independently recollect many of the reasons for his strikes. Thus, he refreshed his recollection by resorting to other persons, as he explained as follows:
"Q. Before you talked to [Investigator] Alvin Kidd or Frank Strickland or Frankie Wall[is], you couldn't remember why you struck them
"A. I knew generally. I knew that Alvin Kidd had said that he knew [veniremember no. 38] and that he didn't want her on the jury. I remember we had a discussion about it as to why. I did not remember the exact details of the discussion, but I knew that I had talked to Alvin. That he knew [her] and that he had said `no' and that Frankie Wall[is] had said `no.' They were all here and that's who I consulted with. They are out in the community much more than I am. They are out investigatingthey know a lot about people where arrests are not even made. It is still good information."
While we do conclude that the prosecutor has provided more likely the real reasons for his strikes than did the prosecutors in Bui v. State, [Ms. 3 Div. 557, May 1, 1992] ___ So.2d ___ (Ala.Cr.App.1992), and Acres v. State, 548 So.2d 459, 470-74 (Ala. Cr.App.1987), his reasons are nonetheless *1135 somewhat speculative, by his own admission. "We appreciate that [nearly three] years have lapsed since the prosecution knew positively that it would be required to come forth with reasons for its strikes. However, we cannot adopt the ... argument that this lapse of time should be reason to diminish the prosecution's burden...." Bui, ___ So.2d at ___.
However, even if we take the explanations now presented as those actually contemplated at the striking, the prosecution still has not overcome the presumption of bias. Initially, we find that only one of the state's strikes is unquestionably race neutral under the circumstances. The prosecutor's reasons for striking veniremember no. 100 was that she did not like the idea of capital punishment and that she indicated that she would rather not serve on the jury. Rumsey's contemporaneous notes and the voir dire support these reasons. A veniremember's reservation about the death penalty is a sufficiently race-neutral reason. Fisher v. State, 587 So.2d 1027 (Ala.Cr.App.), cert. denied, 587 So.2d 1039 (Ala.1991), cert. denied, ___ U.S. ___, 112 S.Ct. 1486, 117 L.Ed.2d 628 (1992). Rumsey's reasons given for striking other veniremembers, however, are either invalid or suspect under the facts of this case.
The prosecutor's reason for striking veniremember no. 38 was that Investigator Kidd told him that he knew her and her husband well; that her husband sold or used drugs; that she was aware of this activity; and that she was friends with a named family who was known to be drug sellers and users, one of whom was prosecuted for murder and another for assault. The prosecutor further stated that Investigator Wallis told him that he had heard that this veniremember's husband was involved with stolen property and drugs and that he "thought" Kidd told him that they had bad feelings toward law enforcement. Rumsey's contemporaneous notes reflect the comment "No ... bad looksknows [Kidd]"; an illegible word followed by her husband's name; a word that appears to be "careful"; her and her husband's places of employment; and the number of her children. Thus, very few, if any at all, of the reasons given were supported by Rumsey's notes. The only comments reflected on the assistant district attorneys' lists are "neat" and "Avondale." Moreover, no voir dire question that would have confirmed the reasons was asked.
The prosecutor's reason for striking veniremember no. 68 was that he was told by a juvenile probation officer that this veniremember was a preacher's wife and that she was compassionate. Although he considered that, in his experience, ministers and their wives are not good jurors in death penalty cases, he admitted that he did not know whether her husband was for or against capital punishment. He also stated that he had told his staff that she would be a good juror in a noncapital case. She did serve on the jury in State v. Long, a noncapital murder case. Rumsey's contemporaneous notes indicate the comments "G.J. ... JMK," "O.K.? ... Ft. McC.," and "OK, husband is a minister ... husband [J.] works at Ft. McClellan." The legible comments on the assistant district attorneys' lists are "neat," "Ft. Mc. office," and "OK." The record does not support the prosecutor's assumption that this veniremember was opposed to the death penalty. In fact, she failed to respond to any of the questions asked of the venire that would have elicited any unfavorable attitude about the death penalty.
The prosecutor's reasons for striking veniremember no. 117 was that he had been told by Investigator Strickland that Strickland knew her and her husband; that her husband had a bad drinking problem; that her husband had been arrested, sometimes with resistance; and that they had a bad attitude toward law enforcement. He further made an unpersuasive and confusing attempt to relate this strike to the facts of this case.[1] Rumsey's contemporaneous *1136 notes contain the comments "not sure at all... probably no," and "?," and some illegible comments. (The "master list," which is the compilation of information gathered in part from law enforcement, reflects no comments.) The assistant prosecutors' comments are "shaggy" and "Lott Mfg." Once again, no voir dire question was asked to confirm the prosecutor's hearsay information.
The prosecutor's reasons for striking veniremember no. 123 was that Investigator Strickland stated that he knew him and his father; that they were very religious; and that he thought that this veniremember "just wouldn't go for the death penalty." Rumsey also stated that he had told his assistant that this veniremember would be a good juror in the assistant's noncapital murder case, State v. Long, and that he would have served on the Long jury had the defense counsel not used his last strike to strike him. Rumsey's contemporaneous notes, however, contain the comments "turquoise shirt ... could be OK" and "Crown," presumably his place of employment, and the listing of two traffic offenses. The assistant prosecutors' comments are "neat" and "Crownsingle." Like veniremember no. 68, this veniremember did not respond to any question calculated to draw an anti-death penalty attitude.
The prosecutor's reason for striking veniremember no. 126 was that Investigator Dennis Surrett told him that this veniremember's brother had been arrested and convicted of two counts of rape or two counts of burglary. However, veniremember no. 126 did not respond to the question, asked of the panel, if any family member had been prosecuted for a felony. Rumsey also stated that he struck him because he did not respond to this question. Rumsey's contemporaneous notes contain the comments "bluecould be OK," "no... Wf Tyson," three "no's," and "related to [J.B.], arrested on 2 [counts] of rape." The assistant prosecutors' comments consist of two illegible words.
The prosecutor's reason for striking veniremember no. 34 was that she did not answer when her panel was asked if any family member had been prosecuted for a felony. He "believed" that he had been told by investigators Wallis and Strickland that she was related to "the Garretts," many of whom had been prosecuted, and that "the Garretts" were related by marriage to "the Swains," many of whom had also been prosecuted. He explained that he "went back and checked" about "the Garretts" and discovered "78 felony indictments returned against them." Rumsey's contemporaneous notes, however, reflect the comments "blue dress" (twice), "don't think she likes cap[ital] murder," and "h[ouse]wife," and an illegible comment. (The "master list," which reflects comments by law enforcement officials, has no comments pertaining to this veniremember.) The assistant prosecutors' comments are "old," "neat," and "retired."
The prosecutor's reasons for striking veniremember no. 36 were that law enforcement officers "thought" that she was related to "the Garretts" and that she did not respond when her panel was asked if any of a veniremember's family members had been prosecuted for a felony. The prosecutor stated that he "did not know which Garretts she was related to," and he admitted that he did not know "for certain" that she was even related to them. He also asserted that she had served on a grand *1137 jury, but that she did not respond when her panel was asked about grand jury service. However, the record reflects that she did respond affirmatively to this inquiry.[2] The prosecutor further stated that because she was "sympathetic" on the grand jury, he did not think she would be a good juror in a capital case. This veniremember served on the jury in the Long case. Rumsey's contemporaneous notes reflect the comments "kin law enf[orcement]," "no," and "divorced, receives child support," and one speeding ticket. The assistant prosecutors' comments are "neat," "Palm Beach div[orced]," and "GJ" and one illegible word.
The prosecutor's reasons for striking veniremember no. 131 were that she was not a "well kept" person, that she appeared to be "slow," and that she frowned at him when he discussed reasonable doubt. The prosecutor also stated that he thought she would be a good juror, but not in this case, and that she served on the jury in another murder case, a fact reflected by the record. Rumsey stated that he also struck the white female sitting next to veniremember no. 131 because she was also frowning. Rumsey's contemporaneous notes reflect the comments "middle age[d]," "don't know," and "dumb," and a man's name, presumably her husband's. The assistant district attorneys' notes reflect the comments "no teeth," "country," and "shaggy."
The prosecutor's reason for striking veniremember no. 35 was that she did not respond when her panel was asked if any veniremember had a family member who had been prosecuted for a felony. The prosecutor stated that Jerry Waldrop, a federal probation officer, stated that one of the veniremember's relatives had a federal conviction. He also stated that investigators Strickland and Wallis told him "that she in fact was kin to the Garretts that we had prosecuted." However, Rumsey conceded that he did not know to which Garrett, having a conviction, she was related. Rumsey's contemporaneous notes reflect the comments "red sweater" and "Jerry WaldropOK, relative has a federal conviction" and an illegible comment. The assistant prosecutors' comments are "hefty," "?," "neat," and two illegible words.
Rumsey's reasons for striking no. 98 was that he was short and effeminate. Rumsey assumed that this type of person had been picked on throughout life and that, thus, he would sympathize with the appellant, who had been abused by the victim.[3] He further stated that, "to the best of his recollection," someone, whom he could not remember, told him that this veniremember was related to G.S., a black state trooper who had been prosecuted for sexual abuse. Veniremember no. 98 did not respond to the question, asked of his panel, "Have either you or a member of your family ever been prosecuted for ... a felony ...[?]" Rumsey's contemporaneous notes reflect the comments "?," "sweet/short ... heavy," and "OK"; his place of employment; and the fact that he had two traffic tickets.
After the direct examination of the prosecutor wherein he stated the reasons for his strikes, the trial court indicated that it would immediately rule. After objection by the appellant, the trial court assured her that, after its ruling, she would have an opportunity to offer rebuttal and the court would then reconsider its ruling. Then, the court ruled that the prosecutor's reasons were race neutral.
Thereafter, the appellant cross-examined District Attorney Rumsey. During the cross-examination and redirect of the prosecutor, he claimed to have struck a white female because someone had told him that *1138 he (Rumsey) had prosecuted her son "for drugs," because he knew that a relative was being investigated, and because she had not been candid in answering the voir dire questions. He also explained that he struck a white male who allegedly had been charged as a deserter from the United States Army and that he felt that this veniremember should have disclosed this during voir dire requesting information about earlier prosecutions. Finally, he stated that he struck a white female who "looked like she was just going to fall to pieces" when he discussed capital punishment.
The appellant then sought to examine some of the jurors to show that the state's proffered reasons were shams or pretexts and some of the struck black veniremembers to show that the prosecutor's explanations were in fact false. She also attempted to subpoena the law enforcement officers who allegedly had provided information about the veniremembers. The trial court refused to allow any of these witnesses to testify. The court did, however, allow the appellant to submit the following written proffer of the expected testimony of the desired witnesses (defense exhibit no. 10):
"Jurors
"[No. 7]Black juror whose mother, father and wife have all been convicted of crimes.
"[No. 26]White juror whose wife was arrested for theft and who has five relatives who have been convicted of crimes.
"[No. 56]White juror whose husband has been convicted of a crime, and who may be related to another person with a conviction, but she is not sure of the relationship.
"[No. 82]Black juror whose mother, uncle, and brother were convicted of crimes, and whose brother was arrested with respect to drugs and child support. Her mother's conviction is for assault and battery.
"[No. 125]White juror whose husband was convicted of carrying a concealed weapon and driving while intoxicated. Acting as a lawyer, Julian King [assistant district attorney] collected a bill against her.
"Alternates
"[No. 127]White alternate with three relatives with criminal records, one of whom (her nephew) has more than a dozen on his record.
"Prosecution Strikes
"[No. 34]has served on a criminal jury before.
"[No. 35]did not know of the felony convictions alleged against the Garrett family, many of whom are distant cousins.
"[No. 36]was on the Long jury and voted guilty. Works with prosecution witness, [J.M.].
"[No. 52]chosen to sit on the Long trial.
"[No. 68]was on the Long jury. Husband employed at Ft. McCle[lla]n and has three convictions. She is a Baptist. Has also sat on another criminal jury.
"[No. 98]knows of no relative who has been prosecuted.
"[No. 123]sat on Long case, and other criminal juries (all of which resulted in convictions) but has at least nine relatives who have been convicted of crimes.
"Most of the criminal history discussed above is taken from records obtained from the official records in this county."
(Emphasis added.) We note that this exhibit does not reflect whether the convictions noted are for misdemeanors or for felonies. Furthermore, certified copies of records of any criminal history would certainly have been the desired method of proof. The appellant also attempted to introduce statistical information that she claims shows a history of racial bias in jury selection in Talladega County. However, it appears from the record that this statistical information was accepted only as a proffer.[4]
*1139 On remand, the state had the burden of articulating clear, specific, legitimate, race-neutral reasons for each strike that were related to the case to be tried. See Ex parte Branch, 526 So.2d 609, 623 (Ala.1987). "In evaluating the race-neutrality of an attorney's explanation, a court must determine whether, assuming the proffered reasons ... are true, the challenges violate the Equal Protection Clause as a matter of law.... At this step of the inquiry, the issue is the facial validity of the prosecutor's explanation." Hernandez v. New York, ___ U.S. ___, ___, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991). "Once the prosecutor has articulated a nondiscriminatory reason for challenging the black jurors, the other side can offer evidence showing that the reasons or explanations are merely a sham or pretext." Id. at 624 (citations omitted).
"The trial judge cannot merely accept the specific reasons given by the prosecutor at face value, see [People v.] Hall, 35 Cal.3d [161,] ... 168, 672 P.2d [854,]... 858-59, 197 Cal.Rptr. [71,] ... 75 [(1983) ]; Slappy [v. State], 503 So.2d [350,] ... 356 [(Fla.Dist.Ct.App.1987)]; the judge must consider whether the racially neutral explanations are contrived to avoid admitting acts of group discrimination. See Slappy, supra. This evaluation by the trial judge is necessary because it is possible that an attorney, although not intentionally discriminating, may try to find reasons other than race to challenge a black juror, when race may be his primary factor in deciding to strike the juror."
Id. at 624. See also Ex parte Thomas, 601 So.2d 56 (Ala.1992) (reversing based on the trial court's accepting the state's reasons at face value). We may reverse the trial court's determination only if it is "clearly erroneous." 526 So.2d at 625. See also Hernandez v. New York.
The most troubling reasons for the state's strikes are that a veniremember's relative had a recorded criminal history (such as arrests, prosecutions, or convictions) and that he or she did not respond when asked on voir dire whether a relative had been prosecuted for a felony. While these reasons are, under some circumstances, valid race-neutral reasons for a strike, see, e.g., Powell v. State, 608 So.2d 411 (Ala.Cr.App.1992); Lynn v. State, 543 So.2d 704 (Ala.Cr.App.1987), aff'd, 543 So.2d 709 (Ala.1988), cert. denied, 493 U.S. 945, 110 S.Ct. 351, 107 L.Ed.2d 338 (1989); under other circumstances, they may be a sham or pretext for discrimination, see Ex parte Bird, 594 So.2d 676, 683 (Ala.1991). In Bird, the Alabama Supreme Court held that "the failure of the State to engage in any meaningful voir dire on a subject of alleged concern is evidence that the explanation is a sham and a pretext for discrimination" and that "if the prosecut[or] thinks that a veniremember may be related to a former defendant, [he] must ask the veniremember." Id. (Citations omitted; emphasis added.) The Bird court also noted that "a simple question directed to the veniremember could have dispelled any doubt about a possible relationship." Id. (Emphasis added.) A "prosecutor's self-imposed ignorance [should not] preclude a Batson claim." Id. (quoting, Note, Batson v. Kentucky and the Prosecutorial Peremptory Challenge: Arbitrary and Capricious Equal Protection, 74 Va. L.Rev. 811, 827 (1988)). Compare Smith v. State, 590 So.2d 388, 390 (Ala.Cr.App. 1991) (wherein the court, in holding that the defendant may not cross-examine jurors or go behind the prosecutor's information to determine if such information was true, stated that a "prosecutor may strike from mistake, as long as the assumptions involved are based on an honest belief and are racially neutral").
Based on this rationale, even assuming that the reasons given by the prosecutor for his strikes of veniremembers nos. 117, 126, 34, 36, 35, and 98 based on their alleged relationship to alleged relatives with alleged recorded criminal history or on their failure to answer the related question *1140 on voir dire are true, we cannot conclude that those reasons are race neutral or facially valid. None of these veniremembers responded affirmatively when asked if any of their family members had been prosecuted for committing a felony (nor did any white veniremembers[5]). The prosecutor never sought to confirm or to refute his assumptions with further questioning. Thus, we conclude that the voir dire examination is void of meaningful questions directed to the black veniremembers in regard to the particular reasons given for striking them.
A prosecutor cannot simply presume, without further questioning to "dispel any doubt," that a veniremember, who is under oath, did not answer a question truthfully merely because the prosecutor has hearsay evidence to the contrary. See Bird. See also Harrell v. State, 571 So.2d 1270, 1272 (Ala.1990), cert. denied, ___ U.S. ___, 111 S.Ct. 1641, 113 L.Ed.2d 736 (1991) (wherein the court noted that "[t]he record fails to show that any of the five blacks responded to the prosecutor's questions in such a way as to give insight into why they were stricken"); Guthrie v. State, 598 So.2d 1013 (Ala.Cr.App.1991), cert. denied, 598 So.2d 1020 (Ala.1992) (trial court's ruling reversed for a total lack of voir dire questioning to support proffered reasons, some of which were based on alleged relationships with persons charged or convicted of crimes); Jackson v. State, 557 So.2d 855, 856 (Ala.Cr.App.1990) (trial court's ruling reversed where prosecutor failed to ask questions on voir dire "relating to the explanation he gave for his strikes of any black veniremember"); Avery v. State, 545 So.2d 123, 127 (Ala.Cr.App.1988) (in addressing the reason that there had been other defendants in prior cases with the same last name, the court observed that the "prosecutor could have resolved her suspicions by asking a few simple questions on voir dire," and that the Branch court found that "intuitive judgment or suspicion by the prosecutor is insufficient to rebut the presumption of discrimination," 526 So.2d at 623); Floyd v. State, 539 So.2d 357, 362 (Ala.Cr.App.1987) (mere suspicion of relationship between veniremember and previously prosecuted defendant with same surname was held insufficient; prosecutor could have easily ascertained what relationship, if any, existed by asking a simple question on voir dire); Acres v. State, 548 So.2d at 473 (striking of veniremember on belief that prosecutor's records showed her to have a conviction not upheld where a review of the records did not support this conclusion; a question on voir dire could have clarified this discrepancy).
Here, the trial court had "nothing on which to make the required `sincere and reasonable effort to evaluate the evidence and explanations based on the circumstances as [it knew] them,'" Bird, 594 So.2d at 683 (quoting Branch, 526 So.2d at 624), except the prosecutor's unsupported assertion that each veniremember struck was related to someone prosecuted for a felony in the face of each veniremember's implied denial of any such relationship. We find that the prosecutor's rationale "in substance, amounted to a `mere general assertion' of nondiscrimination," 594 So.2d at 683, especially in light of each veniremember's silence when asked the question intended to elicit any relationship. Because the prosecutor's suspicion of the veniremember's relationship with someone with a recorded criminal history or the veniremember's failure to answer the related question on voir dire was the sole basis for the prosecution's striking of veniremembers nos. 126, 34, and 35, the judgment must be reversed and the case remanded for a new trial. See Bird, 594 So.2d at 683 ("one unconstitutional peremptory strike requires reversal"); Harrell v. State, 555 So.2d 263 (Ala.1989); Parker v. State, 568 So.2d 335 (Ala.Cr.App.1990).
We further find that the reasons for two other strikes were not race neutral under the circumstances before us: veniremember *1141 no. 68 because she was a minister's wife and veniremember no. 123 because he was "very religious." These veniremembers did not respond when asked whether they had a fixed opinion against the death penalty or whether they not being absolutely opposed to it, "just [did not] like it," or when asked whether any veniremember had "a personal, religious or moral conviction against passing judgment on [his] fellow man." "[A]n explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically" is evidence that the reason was a sham or pretext. Branch, 526 So.2d at 624 (quoting Slappy v. State, 503 So.2d at 355; noting as an example "an assumption that teachers as a class are too liberal, without any specific questions having been directed to ... the individual juror showing the potentially liberal nature of the challenged juror"). See also Williams v. State, 548 So.2d 501, 507-08 (Ala.Cr.App. 1988), cert. denied, 489 U.S. 1028, 109 S.Ct. 1159, 103 L.Ed.2d 218 (1989) (wherein the court noted that strikes based on age-based bias, residence-based bias, and employment-based bias, without any voir dire examination in reference to these biases, raise a strong inference of discrimination). "`Group-based' strikes without `examination of [the] juror apparent in the record to determine any further information about the juror and the juror's competency to serve' caused our Supreme Court `great concern.'" Parker v. State, 568 So.2d at 337 (quoting Branch, 526 So.2d at 626 n. 13). Here, there is even stronger basis of concern, because in this case voir dire examination revealed that the two veniremembers in question did not possess the group trait assumed by the prosecutor. The prosecutor could have easily dispelled any doubt, had there been any, by asking a follow-up question specifically of each veniremember. He cannot, however, presume that, in the absence of a response to specific voir dire questioning as to whether the veniremember is in fact opposed to the death penalty, the veniremember would not vote in favor of the death penalty simply because the veniremember is very religious, is a minister or minister's wife, or even is a member of a particular denomination. "We recognize that in many cases, both criminal and civil, lawyers frequently engage in `stereotyping' when exercising their peremptory strikes. Batson and [Ex parte] Jackson [,516 So.2d 768 (Ala.1986),] severely limit `stereotyping' in particular criminal cases." Branch, 526 So.2d at 626, n. 13. See, e.g., Powell v. State, 548 So.2d 590, 594 (Ala.Cr.App.1988) aff'd, 548 So.2d 605 (Ala.1989) (wherein the court noted that the teacher-veniremember's failure to answer a specific voir dire question calling for any opposition to the death penalty refuted the prosecution's assumption of the group bias that teachers are less prone to invoke the death penalty); Harrell, 571 So.2d at 1272 (veniremembers' responses on voir dire did not support the state's proffered reasons). The record offers nothing to give validity to the prosecutor's assumption about these two veniremembers. Compare Coral v. State, [Ms. 89-1117, March 27, 1992], 1992 WL 95083 (Ala.Cr.App.1992) (in a capital case, the striking of a minister's wife was upheld where a white minister's wife was also struck); Hart v. State, 612 So.2d 520 (Ala. Cr.App.1992) (upholding the strike of a minister's wife, but acknowledging that this reason may be suspect); Yelder v. State, [Ms. 3 Div. 212, October 11, 1991], 1991 WL 238088 (Ala.Cr.App.1991) (in a noncapital case, the striking of a minister was considered race-neutral where the veniremember was involved in prison ministry and where a white veniremember was struck because her husband was a retired minister); Fisher v. State, 587 So.2d at 1036-37 (strike of minister upheld where victim's family had informed the prosecutor that it knew the veniremember, that he would not vote to convict the defendant in any event, and that it did not like him and where the prosecution had sought to challenge this veniremember for cause because of his feelings about capital punishment); Warner v. State, 594 So.2d 664, 666 (Ala. Cr.App.1991), rev'd, 594 So.2d 676 (Ala. 1991) (reason for strike of minister considered race-neutral, in a capital case, where minister proclaimed that he did not believe in the death penalty and he knew one of *1142 the defendants); Bass v. State, 585 So.2d 225, 237 (Ala.Cr.App.1991) (in a noncapital case, strike of "preacher" wearing a large cross was race-neutral where a minister was going to be a defense witness); Currin v. State, 535 So.2d 221 (Ala.Cr.App.), cert. denied, 535 So.2d 225 (Ala.1988) (in a noncapital case, the strike of a minister was upheld; no voir dire response was discussed).
Although we reverse based on the reasons proffered for the strikes of veniremembers nos. 126, 34, 35, 68, and 123, we will comment on the other reasons asserted for veniremember nos. 117, 36, and 98, because the apparent discriminatory nature of the strikes discussed above casts grave doubts about the remaining strikes. See Bird, 594 So.2d at 683, 685; Powell v. State, 548 So.2d at 594. The other reasons asserted to support the strike of veniremember no. 117 were that her husband has a serious drinking problem and that she and her husband had a bad attitude toward law enforcement. We note that the drinking problem of a veniremember's spouse may be a suspect reason for a strike in the absence of evidence that this reason is related to the case to be tried. We recognize that a hostile attitude toward law enforcement has been held to be a valid race-neutral reason. See, e.g., Powell v. State. However, we suggest that, in order to negate the appearance that the strike was based on an unfounded assumption, the prosecution, when asserting such a reason, should provide facts that would support that reason, see, e.g., Yelder v. State, 596 So.2d 596 (Ala.Cr.App.1991) (prosecution cited a specific incident to support strike based on hostility toward law enforcement); or should question the veniremember about any potential bias, Jackson v. State, 594 So.2d 1289, 1294 (Ala.Cr.App. 1991). (This concern also applies to one of the reasons asserted for striking veniremember no. 38.)
The other reasons asserted for veniremember no. 36 were that she served on a grand jury, but that she did not respond when asked about it on voir dire; that Rumsey thought that she was sympathetic on the grand jury and, therefore, that she would not be a good juror on a death penalty case; and that she served on the jury in State v. Long. We note that, contrary to Rumsey's assertion, the record reflects that this veniremember did respond when questioned about grand jury service. The prosecutor's reason that she was a "sympathetic" grand juror is "especially subject to abuse because of [its] insusceptibility to an objective evaluation by the trial judge," Bird, 594 So.2d at 685. We note that the fact that this veniremember served on the jury in State v. Long, struck by an assistant district attorney rather than by Rumsey, does not necessarily pretermit a finding that Rumsey discriminated in the selection of the jury in this case.
In regard to the reasons for striking veniremembers nos. 131 and 98 based on demeanor and body language, we simply note that these types of strikes are also "especially subject to abuse because of their insusceptibility to an objective evaluation by the trial judge," Bird, 594 So.2d at 685. See also Avery, 545 So.2d at 127. In particular regard to the reason for striking veniremember no. 98, i.e., because he was "effeminate" and would thus identify with the appellant, we note that this could be considered a strike based on a group bias never shown to apply to this veniremember, which we have recognized supra to draw concern. A few questions could have either solidified or erased the prosecutor's suspicion and speculation. See Williams.
The last strike not previously discussed is that of veniremember no. 38. This strike was based partly on information provided by law enforcement officers that her husband sold and used drugs and that he stole in order to buy drugs. While these may be valid race-neutral reasons, see Lynn, 543 So.2d at 709, they are not susceptible to the same kind of proof as a strike based on an arrest, prosecution, or conviction, and may under some circumstances be suspect because, not being susceptible to the same kind of proof, they could be easily abused. More suspect, however, was the reason that veniremember no. 38 was a friend of a *1143 named family, who were alleged drug users, one of whom had been prosecuted for murder and another for assault. A simple question to this veniremember or to the panel as a whole regarding an acquaintance with that family could have alleviated any suspicions.
Based on the trial court's acceptance, at face value, of the state's explanations for its striking of veniremembers nos. 34, 35, 68, 123, and 126, which were based exclusively on information not in any way verifiable on the record before us, the judgment must be reversed and this cause remanded for a new trial. Cf. Ex parte Thomas, (wherein the court reversed on the trial court's face-value acceptance of strikes based exclusively on information contained in the document to which only the state had access). We consider to be clearly erroneous the trial court's finding that the prosecutor presented race-neutral reasons for his strikes of veniremembers 34, 35, 68, 123, and 126.
Because the Batson issue is dispositive, we will not consider the other issues raised on this appeal. However, we caution that this opinion is not to be understood as indicating that the other issues have no merit.
REVERSED AND REMANDED.
All the Judges concur.

ON APPLICATION FOR REHEARING
PATTERSON, Presiding Judge.
The appellee, State of Alabama, filed its application for rehearing, with a supporting brief, on September 4, 1992. It raises no new issues in its application, and the issue raised therein was fully addressed and considered by us in our opinion of August 21, 1992, reversing the judgment and remanding the case to the trial court. See page 1134.
In considering the state's application for rehearing, we have reviewed our opinion, and considered the state's brief in support of its application, and we are not persuaded to alter our decision. The application is, therefore, due to be overruled.
Further, we find no basis for granting the state's motion to add to or to correct the facts, as requested in its Rule 39(k), A.R.App.P., motion. Thus, the motion is due to be denied.
APPLICATION FOR REHEARING OVERRULED; RULE 39(k) MOTION DENIED.
All the Judges concur.
NOTES
[1] The prosecutor's attempt was as follows:

"A [T]he particular facts of this case were unusual in thatreally, this goes to the total process of striking the whole jury. We had a white female and a white male who had seen each other. I don't know if you describe it boyfriend and girlfriend or whatever, but the whitepart of their defense in the case was that he had threatened to kill her, that she was afraid of him, and that he [had] stopped her on occasions. That he had had guns and generally, he was just a bad bully type guy.
"Q Talking about the victim as related to the defendant?
"A And further to bear that out, he had been convicted of manslaughter and I believe convicted of rape in another county. I believe that he had in fact drowned a girl when he was raping her back years ago. I felt like this lady might be sympathetic. Judging from what Strickland told me about her husband, sympathetic with his wife.
"Q And you utilized the facts of this particular case relative to striking black jurors, white jurors or any jurors?
"A There's no question about it. You've got a guy who has a manslaughterlike I say, it may have just been manslaughter, but I know about the facts of the case and I know that he drowned a girl while raping her in a creek.
"Q He had served time in the penitentiary?
"A Sure. Yes."
[2] Veniremember no. 36 was the only veniremember with the particular surname on the particular panel in which the affirmative response was given.
[3] Rumsey explained this theory, as follows:

"He was short and effeminate and my experience has been that people like that go through life and a lot of people make fun of them. People pick on them and that their defense would portray Berry as a bad person, a bad man. I felt like that he in effect would sympathize with Ms. Walker. I know that he could sympathize that was acting as a bully, in effectagainst somebody that was acting as a bully."
[4] At one point, the trial court indicated that it was not considering the appellant's proffers in making its decision. We caution that, in reversing, we have reviewed only the question of whether the prosecutor presented race-neutral explanationsonly within the confines of the prosecutor's testimony; we have not looked beyond the facial validity of these reasons to the appellant's rebuttal. Thus, we are not to be interpreted as indicating our view of the trial court's treatment of the appellant's attempts at presenting a rebuttal.
[5] One white veniremember did respond that he had been convicted of possession of marijuana; he was struck by the state.